## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MARK TRZECIAK and JULIE
TRZECIAK on behalf of themselves and
all others similarly situated,

      *Plaintiffs*,

v.

ALLSTATE PROPERTY AND
CASUALTY INSURANCE
COMPANY,

      *Defendant.*

Case No. 21-cv-10737

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Mark and Julie Trzeciak, individually and on behalf of all others similarly situated, bring this action against Defendant Allstate Property and Casualty Insurance Company ("Allstate" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge, the investigation of counsel, and information and belief.

## NATURE OF COMPLAINT

1.    Plaintiffs bring this case against Allstate individually and as a class action on behalf of thousands of other similarly-situated Allstate Michigan personal

auto insurance policyholders who have been harmed by Allstate's illegal, unfair, and intentionally discriminatory conduct described below.

2.      Allstate has knowingly betrayed the loyalties of thousands of its long-time Michigan auto policyholders through its implementation of a discriminatory rate-setting scheme, which involves Allstate charging higher premiums to its more tenured policyholders than it charges otherwise identically-situated newer policyholders for the same or materially the same coverages. As Allstate is well aware, its conduct lacks any actuarial basis (indeed, it defies basic actuarial principles).

3.      Pursuant to this scheme, Allstate unilaterally places many Allstate policyholders on what a recent Consumer Reports investigative report referred to as a "suckers list."[1] Allstate charges those policyholders on the "suckers list" higher auto insurance premiums, for materially the same policies and same coverages, than the premiums charged to otherwise identically-situated Allstate policyholders, based on Allstate's secret, purely internal projection of whether and how much premium each policyholder is willing to tolerate being charged and still remain an Allstate customer.

---

[1] https://www.consumerreports.org/media-room/press-releases/2020/02/investigation-findsallstates-secret-algorithm-resulted-in-sucke/ (last accessed April 28, 2020); see also https://themarkup.org/allstates-algorithm/2020/02/25/car-insurance-suckers-list (published Feb. 25, 2020).

4.     Allstate implements this unfair discriminatory practice by unilaterally assigning each Allstate auto policyholder into thousands, if not hundreds of thousands, of "microsegments," which assignments are made exclusively by Allstate itself based on Allstate's internal projection of each policyholder's tolerance (or "inelasticity") to premium changes, which projections, in turn, Allstate makes using secret algorithm(s) designed by Allstate and based on secret data.

5.     After assigning each such Allstate policyholder into a microsegment by this method, Allstate then applies a microsegment-specific "Complimentary Group Rating" ("CGR") factor to each microsegment.[2] The CGR factor, in turn, acts as a "multiplier" that modifies—as a last step in the premium calculation process—the premium that would otherwise apply to the policyholder under the other factors used in calculating the premium (i.e., a positive CGR factor causes the premium that is charged to that policyholder to increase).

6.     Thus, otherwise identically-situated Allstate policyholders who would otherwise be charged the same premiums, are charged different premiums for the same coverages based purely on Allstate's internal projection of their respective elasticity or inelasticity to premium changes. Allstate policyholders whom Allstate

---

[2] The CGR factor is alternatively referred to by Allstate as a "Table Assignment Number" ("TAN"). They will collectively be referred to as "CGR" in this Complaint.

assigns to a microsegment with a positive CGR factor, by definition, pay higher premiums than otherwise-identically situated Allstate Michigan policyholders whom Allstate assigns to a microsegment with a lower, neutral (i.e., 1.0), or negative (<1.0) CGR factor.

7.    The term "microsegment" is a deliberate misnomer. Allstate's use of microsegments in Michigan results in nearly every Allstate Michigan policyholder, if not every single one of them, being assigned to their very own microsegment as determined by Allstate's internal projection of that policyholder's "inelasticity" (or tolerance) to premium changes, as described herein.

8.    The assignment of the policyholders to the microsegments, and thus the determination of which CGR factor and, ultimately, which of the essentially infinite number of potential premiums will be charged to each policyholder, is made by Allstate itself in its discretion, purely as a matter of internal policy and practice (i.e., the secret algorithm(s)) and is not discernible by policyholders or any members of the public. Allstate does not disclose anywhere the methodology or data sources it uses for the microsegment placement, and there is no way for any policyholder or any other member of the public to figure out what their microsegment (or their CGR factor) is, would be, will be, or why or how they were assigned to a particular microsegment.

4

9.     The effect of this unfair discriminatory practice on a policyholder's premium can be drastic. Allstate's microsegment assignment (and thus the CGR that is applied) can increase an individual policyholder's premium by up to 850% or decrease it by up to around 90%. This results in drastically different premiums being charged, for the same policies and coverages, to Allstate policyholders whom Allstate's secret algorithm(s) project as having different sensitivities to premium changes but who are otherwise identically-situated and who are exactly the same from a risk perspective. Those who are charged more end up unwittingly subsidizing those who are charged less for the same insurance coverages. On information and belief, most Allstate Michigan policyholders are assigned by Allstate to a microsegment with a positive CGR factor, and the magnitude of premium increases applied to those policyholders significantly exceeds the decreases to premiums applied to the minority of policyholders who are assigned to microsegments with negative CGR factors.

10.     Allstate's unlawful conduct has contributed to the State of Michigan having the "highest auto insurance rates in the country."[3]

11.     As a result of Allstate's unlawful pricing scheme, Plaintiffs and the members of the proposed Class (defined below) incurred economic harm in an

---

[3]     https://www.consumerreports.org/car-insurance/allstate-car-insurance-pricing-michigan-regulators-raise-objections/.

5

amount to be proven at trial. Plaintiffs by this action seek damages, court costs and expert witness fees, a permanent injunction to stop Allstate from engaging in the alleged discriminatory conduct, which conduct is ongoing, and other relief enumerated below.

## PARTIES

12. Plaintiff Mark Trzeciak is a resident of Dearborn, Michigan, and is an Allstate Michigan auto insurance policyholder. At all material times, he had auto insurance that was created and underwritten by Allstate, sold to her through Allstate agents managed, supervised, and controlled by Allstate.

13. Plaintiff Julie Trzeciak is a resident of Dearborn, Michigan, and is an Allstate Michigan auto insurance policyholder. At all material times, she had auto insurance that was created and underwritten by Allstate, sold to her through Allstate agents managed, supervised, and controlled by Allstate.

14. Defendant Allstate Property and Casualty Insurance Company ("Allstate") is an Illinois corporation that maintains its principal place of business at 51 W Higgins Rd Ste T2b, South Barrington, IL 60010.

15. Allstate is authorized by the Michigan Secretary of State to do business in the State of Michigan as a foreign corporation and is authorized by the Michigan Department of Insurance ("MDI") as a licensed insurer.

16.     Allstate issued the policy at issue to Plaintiffs.  See Exhibit A attached hereto.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Classes is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Classes each consist of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

20.     This Court has personal jurisdiction over Allstate because Allstate is registered to do business in Michigan, has sufficient minimum contacts in Michigan, and otherwise intentionally avails itself of the markets within Michigan through its business activities, such that the exercise of jurisdiction by this Court is proper and necessary. Moreover, the claims of Plaintiffs and all of the class members in this case, who are current or former Allstate policyholders subjected to Allstate's conduct alleged herein, arise out of and directly relate to Allstate's contacts with Michigan.

21.     Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs resides in this District, Allstate conducts substantial business in this District, and a

substantial part of the events giving rise to Plaintiffs' and the class members' claims occurred in this District.

## GENERAL ALLEGATIONS

**A.     Allstate is a Major Auto Insurance Provider in Michigan.**

22.     Allstate is the fifth largest writer of private passenger auto insurance in Michigan.

23.     In 2019, it wrote direct premiums valued at approximately $768,932,000, accounting for approximately 7.7% of the total market.[4]

24.     Auto insurance is the main form of driver responsibility legally required of Michigan drivers, and is a significant expenditure for individuals and families. For many insureds/families, auto insurance premiums represent a significant percentage of annual household income.

25.     What's more, according to a 2019 University of Michigan report, Michigan has the highest auto insurance rates in the country. Annual premiums in the state are double the national average, with much of the burden falling on low-income and minority communities. Auto insurance customers in Detroit, where more than

---

[4]     https://www.iii.org/publications/a-firm-foundation-how-insurance-supports-the-economy/state-fact-sheets/michigan-firm-foundation.

three-quarters of residents are Black, pay almost twice the average premium for Michigan as a whole.

**B.   Allstate Unfairly Discriminates Against Policyholders.**

26.   Allstate implements a policy and practice to unfairly and arbitrarily discriminate against policyholders by exercising its discretion to determine what factors to employ in calculating premiums.

27.   As the "tenure" of certain Allstate policyholders increased (i.e., as they remained insured with Allstate), Allstate implemented a way to unfairly and arbitrarily discriminate against those tenured policyholders compared to newer policyholders also insured with Allstate.

28.   Since at least on or about June 26, 2014, and continuing to this day, Allstate has carried out a practice of intentional, differential, and unfairly discriminatory treatment among its Allstate Michigan auto policyholders.

29.   In order to squeeze as much money (i.e., premium) out of its policyholders as possible, Allstate unilaterally assigns each Allstate Michigan policyholder into one of thousands of Allstate "microsegments" (a deliberately misleading term created by Allstate). These "microsegments" are set up by Allstate to ensure that few, if any, policyholders are grouped together despite otherwise have similar risk profiles.

30.     Such assignments are determined exclusively by Allstate and are based on Allstate's internal application of a secret algorithm(s) designed by Allstate using secret data to project each policyholder's relative "elasticity" or "inelasticity" to premium price changes.

31.     Under this discriminatory conduct, by its very design, those Allstate Michigan policyholders whom Allstate projects are relatively "inelastic" (i.e., less sensitive) to premium price changes are charged higher premiums than otherwise identically-situated (including from a risk perspective) Allstate Michigan customers whom Allstate projects are relatively "elastic" (i.e., more sensitive) to premium price changes.

32.     Each of the microsegments carries with it a microsegment-specific "CGR factor" that in essence acts as a premium "multiplier," increasing (positive CGR) or decreasing (negative CGR) the premium that would otherwise apply to the policyholder (i.e., before the application of the CGR factor). The CGR factor is applied as the last step in the process of calculating the policyholder's premium.

33.     The effect of Allstate's conduct on a policyholder's premium can result in drastically different premiums being charged, for the same policies and coverages, to Allstate Michigan policyholders whom Allstate's secret algorithm(s) project as

10

having different sensitivities to premium changes but who are otherwise identically-situated and who are exactly the same from a risk perspective.

34.     On information and belief, and investigation of counsel, Allstate assigns most Allstate Michigan policyholders to microsegments with positive CGR factors, while a minority are assigned to microsegments with negative CGR factors, and the average magnitude of the premium increases (positive CGRs) significantly exceeds the average magnitude of the premium decreases (negative CGRs).

35.     The secret algorithm(s) that Allstate uses to make the microsegment assignments is not risk-based. It is not based on the expected risk and losses for the policyholder. Rather, it uses factors (including the policyholder's tenure with Allstate) to project the policyholder's elasticity or sensitivity to premium price changes. Policyholders with greater tenure with Allstate are generally viewed and projected by Allstate to be less elastic (i.e., less sensitive) to premium price changes, and thus under Allstate's discriminatory conduct, all else being equal, they are generally charged higher premiums for the same policies and coverages than otherwise identically situated customers with less tenure.

36.     Allstate's discriminatory conduct alleged herein disproportionately harms longer tenured Allstate customers. For example, Consumer Reports found, in

analyzing data regarding Allstate's similar conduct in other states, that "[m]iddle-aged drivers were overwhelmingly given larger increases."

37.    Allstate's differential treatment and conduct alleged herein lacks any actuarial basis. In fact, it defies basic actuarial principles. It is well accepted in the insurance industry, and as a basic principle of actuarial science, that longer tenured insurance policyholders generally have a more favorable loss experience (i.e., lower losses, lower risk) than less tenured policyholders, and that new customers generally have the worst loss experience of all. Moreover, as alleged above, Allstate has conducted its own internal studies that confirmed this basic actuarial principle.

38.    And yet Allstate's differential treatment and assignment of policyholders into microsegments penalizes a policyholder's longer tenure with the company, using that policyholder's tenure and loyalty as one of the major factors, if not the primary factor, in determining which policyholders to include on what *Consumer Reports* characterized as its "suckers list."

39.    Allstate's microsegment assignments are not risk-based. In essence, by its discriminatory practice alleged herein, Allstate is not evaluating insurance risk; rather, it is evaluating price elasticity to identify those Allstate Michigan policyholders it can exploit (i.e., the "suckers"), to charge those policyholders more than otherwise identically-situated Allstate Michigan policyholders for the same

12

coverages, and in fact to charge the "suckers" as much as Allstate's algorithm(s) projected Allstate can get away with without losing them as customers.

40.     Because of its discriminatory conduct, the MDI has raised objections to Allstate's car insurance pricing, pointedly asking if two policyholders with the same risk profile could end up paying different rates for car insurance, which is a standard test for determining unfair insurance pricing.[5] Regulators also asked several questions about Allstate's process for assigning customers to microsegments, which was the process *Consumer Reports* reported on that caused customers to be charged different rates based on perceived risk of switching insurance companies (i.e., the "suckers").[6]

41.     Plaintiffs in this case are not challenging any of the number of Allstate Michigan filed rates or rating factors as being unreasonable or excessive, but rather are challenging Allstate's internal discriminatory conduct as alleged herein.

42.     As alleged below, Plaintiffs are among the many Allstate auto policyholders who have been harmed by Allstate's price tolerance scheme.

43.     Allstate's unfair discriminatory practices alleged herein were carried out by Allstate itself, as a matter of internal company policy and practice.

---

[5]     https://www.consumerreports.org/car-insurance/allstate-car-insurance-pricing-michigan-regulators-raise-objections/;  *see also* https://assets.documentcloud.org/documents/20470119/difs-allstate-objection-letter.pdf.

[6] *Id.*

44.     Allstate's use of thousands of different microsegments in Michigan ensures that each Allstate auto policyholder in Michigan will be assigned by Allstate into their own individual microsegment, creating a near infinite number of premium rates that can theoretically be charged to any policyholder. Because the assignment of policyholders to the microsegments (with their accompanying CGRs) is done entirely by Allstate itself, at its discretion based on its secret algorithm(s), Allstate essentially has carte blanche to pick the rate that it will charge each policyholder, from among the immense number of potential rates that have been filed. In other words, Allstate has attempted (successfully in Michigan up until this point) to give itself essentially complete discretion to charge Allstate Michigan policyholders virtually any rate Allstate chooses (without disclosure), as informed by Allstate's internal projection of how much premium each policyholder will tolerate.

45.     Moreover, because the algorithm(s) used are secret, Allstate's unilateral assignments are carried out entirely in the dark, beyond the view of the policyholders, the public, and even the regulator. Allstate's secret algorithm(s), the basis for Allstate's microsegment assignments and price tolerance discrimination, are nowhere to be found in Allstate's rate filings with MDI, nor are any of the data that Allstate uses in applying the algorithm(s).

14

46.     Clearly, no Allstate Michigan auto policyholder or other member of the public could discern from available information what their microsegment is or would be, what their CGR rating factor is or would be, the reasons why Allstate placed them in such a microsegment/CGR, or the data (or even the nature of the data) used by Allstate for such determination. Allstate makes its microsegment assignments, which in turn can dramatically impact which of the numerous possible rates will apply to each policyholder, unilaterally with no transparency.

47.     Moreover, with respect to the regulator, Allstate has gone to great lengths to hide its complex assignment process and price tolerance discrimination from the MDI.   Only after *Consumer Reports* raised the alarm about Allstate's discriminatory conduct did the MDI raise objections to Allstate's insurance pricing, specifically inquiring as to the practices alleged herein.[7]

## C.     Allstate is Aware That Its Conduct Is Unfairly Discriminatory in Violation of Michigan Law.

48.     At all relevant times, Allstate knew that its conduct alleged herein is discriminatory and unlawful.

49.     Allstate has attempted to implement the same or similar discriminatory practices, described herein, in several of the other states where Allstate offers auto

---

[7]     https://www.consumerreports.org/car-insurance/allstate-car-insurance-pricing-michigan-regulators-raise-objections/.

insurance. In those states where regulators have been able to get a closer look at what Allstate is actually doing/proposing to do (e.g., where the regulatory regime in the state requires "prior approval" of rating plans before they are utilized in the state), Allstate's practice has repeatedly been rejected as blatantly discriminatory.

50.    For example, in 2014, Florida rejected Allstate's plan to set individuals' premium based on his or her "modeled reaction to rate changes," determining it was "unfairly discriminatory."

51.    Likewise, Maryland rejected Allstate's proposal to implement this practice, resulting in Allstate withdrawing the proposal and the Maryland regulator issuing a bulletin declaring that "price optimization" practices such as that proposed by Allstate "results in rates that are unfairly discriminatory".

52.    Likewise, Georgia disapproved a proposal by Allstate to implement this practice, stating that it "does not allow the use of price optimization."

53.    Allstate withdrew similar proposals in multiple other states (including Louisiana and Rhode Island) after regulators asked pointed questions about the practice.

54.    Numerous states have also explicitly confirmed that "price optimization" practices more generally (of which Allstate's practice alleged herein is an iteration or is at least largely analogous) are discriminatory, illegal under similar anti-

16

discrimination statutes, and banned. Those states include Ohio, California, Florida, Vermont, Washington, Indiana, Pennsylvania, Maine, Rhode Island, Montana, Delaware, Colorado, Minnesota, Connecticut, Alaska, Missouri, Virginia, and the District of Columbia.

55.     Allstate is well aware of these pronouncements and bans, and of the resounding message associated therewith—insurance rates must be based on risk-related factors, and cannot be based on non-risk-related factors such as how much an insurer can manage to squeeze out of each policyholder.

56.     Erasing any doubt whatsoever that Allstate knew it was acting in bad faith, Allstate was confronted about its microsegmenting/price tolerance scheme at least as early as 2014, by the MDI.[8]

57.     While reviewing its 2014 proposal, the insurance department asked Allstate point blank whether it was using "price optimization," the industry term for setting premiums based on nondriving factors, such as a customer's likelihood to defect to a competitor, stating "we want to be sure that there is not a conflict with indicated relativities in a way that raises rates for policyholders it retains and reduces premiums for new business in order to attract those risks."

---

[8]     https://www.documentcloud.org/documents/6779144-Allstate-Michigan-Objection-Response.html.

58.     Allstate responded by saying that "Complementary Group Rating (CGR) adds one additional rating calculation step to the existing filed rating structure. This step assigns a micro-segment to a Complementary Group for use in determining the insured's premium." Allstate later explained that "[t]he Complementary Group factor assigned for a micro-segment is determined based on the following: Expected loss costs; Policyholder disruption". In other words, Allstate admitted that the CGR factor considers the likelihood that a given policyholder will remain with Allstate.

59.     Further confirming its discriminatory scheme, Allstate confirmed in its 2014 letter that its system is designed to ensure that policyholders will be charged discriminatory rates because included are highly individualized factors such as "rating territory, date of birth, and years with prior carrier".

60.     Allstate doubled down on its discriminatory scheme in a 2021 letter to the MDI.[9] In response to a question about the TAN[10] rating for identical policies with the same characteristics, Allstate confirmed that "identical risks…will be charged the same premium" but then shockingly said "Allstate has not yet found any identical

---

[9]     *See*       https://beta.documentcloud.org/documents/20470113-allstate-michigan-objction-response-1-26-21 (last accessed March 2, 2021). While the letter is listed as coming from "Allstate Fire and Casualty Insurance Company", the letter makes clear that the TAN rating is interchangeable between Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company.

[10] The "TAN rating" is used interchangeably with CGR by Allstate.

risks in Michigan."

61.     Allstate was confronted about similar practices in 2015 by the Texas Office of Public Insurance Counsel ("OPIC"), an independent Texas state agency created in 1991 with a mission of "represent[ing] consumers in insurance matters."[11]

62.     OPIC subpoenaed certain confidential (non-public) information from Allstate about the microsegmenting practices alleged herein. These records are not found in any public filings.

63.     After analyzing this confidential information, OPIC sent a letter in October 2015 which Allstate received (not available through the public SERFF database) stating that the confidential information OPIC reviewed showed that:

> [R]etention models were [being] used [by Allstate] to assess policyholders' likelihood of changing carriers due to a rate change. Individual policyholders were then assigned to CGR microsegments that reflected … that likelihood. The CGR microsegment assignment then affected the level of rate increase or decrease a policyholder received as a result of the overall rate filing. For example, those more likely to accept a rate increase received proportionally larger increases while those more inclined to select another company received smaller increases.

64.     OPIC's letter forcefully called out Allstate's intentional unfair discrimination. OPIC stated that "CGR-based rates both ignore actuarial indications and create class distinctions that are neither risk nor cost-based. Essentially, rating

---

[11] https://www.opic.texas.gov/what-we-do/.

distinctions are based on a policyholder's sensitivity to price change." OPIC further commented that Allstate's practice and secret algorithm(s) were designed as a "mechanism for cross-subsidies among risks … it is clear that some policyholders shoulder a higher rate so another can gain a lower rate." OPIC further explained that Allstate's conduct constitutes intentional violations of the applicable Texas Insurance Code.

**D.     Plaintiffs and Class Members Incurred Economic Damages Due to Allstate's Unfair Discrimination.**

65.    As a result of Allstate's unfair discriminatory scheme alleged herein, Plaintiffs and each member of the proposed Class incurred actual out of pocket economic damages.

66.    As a result of Allstate's discriminatory "price tolerance" practice alleged herein, Plaintiffs Mark Trzeciak and Julie Trzeciak and at least hundreds of thousands of other Allstate Michigan auto policyholders were assigned by Allstate to a microsegment with a corresponding positive CGR factor—as a result of Allstate's internal application of its secret algorithm(s) and projection thereby regarding their relative sensitivity to premium price changes. They are on Allstate's "suckers list" (a term borrowed from the Consumer Reports assessment of Allstate's behavior) and have been and are unwittingly being charged higher premiums for the same policies

and coverages than other Allstate Michigan customers who are otherwise identically situated (including from a risk perspective).

67.    Plaintiffs and each member of the proposed Classes paid more to Allstate than they would have paid but for Allstate's discriminatory conduct alleged herein.

68.    Plaintiffs and the proposed Class are entitled to recover economic damages, restitution and obtain injunctive relief for Allstate's unfair discrimination.

**E.    Fraudulent Concealment, Tolling and Discovery Rule.**

69.    Allstate does not disclose its unfairly discriminatory practices alleged herein, and in fact actively conceals them.

70.    Allstate does not disclose in its public filings, or anywhere else that any Class member or member of the public could see or reasonably see, that it engages in the price tolerance scheme or that it otherwise engages in non-risk based differential treatment of its Michigan policyholders. Allstate, in fact, went to great lengths not to disclose (i.e., to conceal) that information, its microsegment assignment process, and the secret algorithm(s) and underlying data that Allstate utilizes for this scheme.

71.    No class member or member of the public, including Plaintiffs themselves, could in the exercise of reasonable diligence know that Allstate has engaged in the alleged unfairly discriminatory conduct.

72.     No reasonably diligent Allstate policyholder (including Plaintiffs) or potential policyholder determine what microsegment they have been or would be placed in, how that determination was or would be made, or the consequences.

73.     Additionally, Allstate does not publicly state anywhere, and in fact affirmatively conceals, that its conduct alleged herein has the intended and expected effect of causing more tenured Allstate Michigan policyholders to generally pay higher premiums, for the same coverages, than new or less tenured policyholders.

74.     Allstate's disclosure of information is so scant that there is no way – based on publicly available information – for Plaintiffs or class members to determine if they have been economically harmed by Allstate's conduct. Accordingly, Plaintiffs' and class members' claims, even if not equitably tolled, have yet to accrue.

## PLAINTIFFS' SPECIFIC ALLEGATIONS

### Plaintiffs Mark & Julie Trzeciak

75.     Plaintiffs have been Allstate Michigan auto policyholder since approximately 2010.

76.     Plaintiffs are members of the proposed Class (defined below).

77.     Plaintiffs were injured by Allstate's unfair discrimination against them. On information and belief, in one or more years since 2010, Allstate unilaterally assigned Plaintiffs to a microsegment with a positive CGR factor, based on Allstate's

22

internal projection of their elasticity to premium price changes. As a result, Plaintiffs were charged higher premiums than otherwise-identically situated (including from a risk perspective) Allstate Michigan policyholders for the same policy and coverages.

78.    In one or more years since 2010, Plaintiffs were charged more by Allstate than they would have been charged but for Allstate's discriminatory conduct.

79.    At all relevant times, Allstate concealed from Plaintiffs its unfairly discriminatory conduct alleged herein. Plaintiffs did not know about, and in the exercise of reasonable diligence, could not have discovered for themselves Allstate's conduct.

80.    As a result of Allstate's misconduct alleged herein, Plaintiffs suffered economic harm.

## CLASS ACTION ALLEGATIONS

75.    Plaintiffs bring this action as individuals and as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2),  and (b)(3) against Allstate on their own behalf and on behalf of the following "Class":

> All Allstate Michigan personal auto policyholders who were assigned by Allstate into a microsegment with a corresponding positive CGR factor.

76.    Excluded from the Classes are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) Allstate and affiliated entities, their

employees, officers, directors, and licensed agents; (c) Allstate's legal representatives, assigns and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

77.   Plaintiffs reserve the right to modify the foregoing class definitions, or to create subclasses as the Court deems necessary.

78.   **Numerosity (FRCP 23(a)(1)):** The class satisfies the numerosity requirement because it is composed of hundreds of thousands of persons.  The exact number of class members can readily be determined upon review of policy information and other records maintained by Allstate. The class members are therefore so numerous that joinder of all members is impracticable. The number of class members is so large that joinder  of all its members is impracticable.

79.   **Commonality and Predominance (FRCP 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual  questions include, but are not limited to:

> a) Whether Allstate, through its conduct alleged herein, has engaged in unfair discrimination between individuals of the same class and of essentially the same hazard in the amounts of premiums, policy fees, or rates;

b) Whether Allstate, through its conduct alleged herein, has permitted the unfair discrimination between individuals of the same class and of essentially the same hazard in the amounts of premiums, policy fees, or rates;

c) Whether Allstate's conduct alleged herein was based on "sound actuarial principles";

d) Whether Allstate's conduct alleged herein violated the covenant of good faith and fair dealing;

e) Whether Allstate was unjustly enriched by its conduct alleged herein;

f) Whether Plaintiffs and class members are entitled to damages and/or restitution; and

g) Whether Plaintiffs and class members are entitled to equitable relief against Allstate, including an injunction stopping Allstate's alleged misconduct.

80.    **Typicality (FRCP 23(a)(3):** Plaintiffs' claims are typical of class members' claims. Plaintiffs and the other Class members were all subject to Allstate's price tolerance scheme alleged herein. Plaintiffs have substantially the same interest in this matter as all other members of the respective class they are part of, and their

claims arise out of the same set of facts and conduct as those of the other class members.

81. **Adequacy of Representation (FRCP 23(a)(4)):** Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in insurance, class action, and federal court litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of class members. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other class members they seek to represent. Plaintiffs have no disabling conflicts with class members and will fairly and adequately represent the interests of class members.

82. Class certification under Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

83. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT
**(On behalf of Plaintiffs and the Class)**

84.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

85.    Plaintiffs bring this cause of action on behalf of themselves and the other members of the Class.

86.    Plaintiffs and the Class entered into uniform automobile insurance contracts with Defendant.

87.    Implied in every contract in the State of Michigan, including contracts of insurance, is an implied covenant of good faith and fair dealing.

88.    Allstate's uniform automobile insurance contracts at issue here left various terms to the sole discretion of Allstate. Of particular relevance here, Plaintiffs and the putative class members had no opportunity to negotiate the price of their insurance premiums, and the pricing, and the factors used to determine pricing, was left to be determined in the sole discretion of Allstate.

89.    Furthermore, Allstate's uniform automobile insurance contracts at issue here provided Allstate with discretion in the face of a lack of clarity and/or omission

27

from the contracts as to what factors it would use to determine pricing of insurance premiums.

90.    As described herein, Allstate unilaterally chose how it would price the monthly premiums, including what factors it utilized, without disclosure to Plaintiffs and the putative class members, and decided to use arbitrary and unfair discriminatory microsegments in connection with that decision.

91.    In doing so, Defendant exercised its discretion in bad faith and violated the implied covenant of good faith and fair dealing.

92.    As a result, Allstate is liable to Plaintiffs and the Class members for the compensatory and consequential damages they suffered.

## COUNT II

### UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Class and the Alternative to Count I)

93.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

94.    Plaintiffs bring this cause of action on behalf of themselves and the other members of the Class in the alternative to their claim for breach of contract.

95.    Plaintiffs and Class Members never agreed to purchase auto insurance premiums from Defendant at an inflated price, based on hidden pricing factors such as "price elasticity" as alleged herein.

96.   At all relevant times, Plaintiffs and Class Members were unaware that Defendant inflated the price of its auto insurance premiums as alleged herein.

97.   Plaintiffs and Class Members conferred benefits on Defendant by purchasing auto insurance premiums at an inflated price.

98.   Defendant has knowledge of such benefits.

99.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the auto insurance because the Defendant will obtain the benefits conferred by Plaintiffs and the Class Members without adequately compensating Plaintiffs and the Class Members. Defendant failed to adequately compensate the Plaintiffs for the benefits conferred by purchasing the auto insurance at an inflated premium price.

100.   Retention of those moneys under these circumstances is unjust and inequitable because: Plaintiffs and Class Members paid an inflated price for the auto insurance based on the discriminatory and unlawful conduct alleged herein.

101.   This has resulted in injuries to Plaintiffs and members of the Class because they would not have purchased (or paid an inflated price premium) the auto insurance policies that they did had they known the true facts regarding Allstate's unlawful pricing scheme.

102.   Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, and because equity and good conscience requires restitution, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, as applicable, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    An order certifying the class and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

B.    Awarding Plaintiffs and the proposed Class members damages;

C.    Awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

D.    Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

E.    Awarding attorneys' fees and costs; and

F.    For such other and further relief as the Court may deem necessary or appropriate.

Dated: March 31, 2021                    Respectfully submitted,

                                         **FINK BRESSACK**

                                         */s/ David H. Fink*
                                         David H. Fink (P28235)
                                         Nathan J. Fink (P75185)
                                         38500 Woodward Ave., Suite 350
                                         Bloomfield Hills, MI 48304
                                         Phone: (248) 971-2500
                                         dfink@finkbressack.com
                                         nfink@finkbressack.com

                                         Gary M. Klinger
                                         **MASON LIETZ & KLINGER, LLP**
                                         227 W. Monroe St., Ste. 2100
                                         Chicago, Illinois 60606
                                         Phone: 202.975.0477
                                         gklinger@masonllp.com

                                         Daniel K. Bryson*
                                         Patrick M. Wallace*
                                         Jeremy R. Williams*
                                         **WHITFIELD BRYSON LLP**
                                         900 W. Morgan St.
                                         Raleigh, NC 27603
                                         Telephone: (919) 600-5000
                                         Facsimile:  (919) 600-5035
                                         dan@whitfieldbryson.com
                                         pat@whitfieldbryson.com
                                         jeremy@whitfieldbryson.com

                                         *Counsel for Plaintiffs and the Proposed Class*

                                         * Application for admission forthcoming
                                           32

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: March 31, 2021                    Respectfully submitted,

**FINK BRESSACK**

*/s/ David H. Fink*
David H. Fink (P28235)
Nathan J. Fink (P75185)
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
Phone: (248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

Gary M. Klinger
**MASON LIETZ & KLINGER, LLP**
227 W. Monroe St., Ste. 2100
Chicago, Illinois 60606
Phone: 202.975.0477
gklinger@masonllp.com

Daniel K. Bryson*
Patrick M. Wallace*
Jeremy R. Williams*
**WHITFIELD BRYSON LLP**
900 W. Morgan St.
Raleigh, NC 27603
Telephone: (919) 600-5000
pat@whitfieldbryson.com

* Application for admission to be filed
Counsel for Plaintiffs and the Proposed Class

33